IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE U.S. SMALL BUSINESS ADMINISTRATION, as Receiver for Acorn Technology Fund, L.P. | : : : : | CIVIL ACTION |
| Plaintiff, | : | NO. 03-5982 |
| | : | |
| v. | : | |
| | : | |
| RICHARD D. PROPPER, et al., | : | |
| | : | |
| Defendants. | | |

**MEMORANDUM**

Giles, J.                                                                October 2, 2008

**I. Introduction.**

The court considers cross-motions for summary judgment.  Plaintiff U.S. Small Business Administration ("SBA"), as Receiver for Acorn Technology Fund, L.P. ("Acorn") has moved for summary judgment against Defendants Richard D. Propper, Kerry S. Propper, P. Timothy Garton, Michael D. Chermak, Charles R. Smith, and Kenneth M. Borrow (collectively, "Individual Defendants") and Acorn Connecticut Investments, L.P. ("ACI") (collectively, "Defendants"). Defendant ACI and its general partner, Daniel Beharry, have filed for summary judgment against the Receiver.  The ultimate issue raised is whether Defendants are not excused as a matter of fact and law from paying to Acorn $1,038,333, the unpaid balance on their collective capital commitments made almost ten years ago.  For the reasons that follow, the court grants Receiver's Motion for Summary Judgment and denies ACI and Beharry's Motion for Summary Judgment.  We conclude that Defendants are obligated to fulfill their capital commitments to Acorn, with interest, because neither SBA nor Acorn excused Defendants from that contractual responsibility.

## II.  General Background.

In June 1998, the Acorn Fund applied for a license from the SBA to operate as a Small Business Investment Company ("SBIC") pursuant to the Small Business Investment Act of 1958 ("the SBIC Act").[1]  Acorn, a New Jersey limited partnership formed in September 1997, and defendant ACI, a Connecticut limited partnership formed by Daniel Beharry in January 1999 for the specific purpose of investing in the Acorn Fund, created Subscription Documents for Limited Partnership Interests ("Subscription Agreement," Pl. Ex. A) on January 13, 1999, though the Subscription Agreement was not signed until December 1999.  ACI provided a vehicle by which investments from ACI's multiple individual limited partners could be aggregated into a single investment in the Acorn Fund.  (Beharry Dep. at pp.75-82.)  Acorn Technologies, LLC ("ATP") was the general partner of the Acorn Fund.

Under the Subscription Agreement, each Defendant "irrevocably subscribe[d] for and agree[d] to purchase the dollar amount . . . indicated on the signature page" of the Agreement in exchange for a limited partnership interest (emphasis added).  (Subscription Agreement § 1.1, Pl. Ex. A at 001-03022.)  It is undisputed that each Defendant signed his respective page of the Subscription Agreement, and received his limited partnership interest in Acorn.  (Defendants' Answers to Requests for Admissions, Pl.'s Ex. B, Nos. 13, 18.)  The parties to the Subscription Agreement agreed that the Agreement "contain[ed] the entire agreement of the parties, and there [we]re no representations, covenants or other agreements except as stated or referred to herein." (Subscription Agreement § 3.5, Pl. Ex. A at 001-03027.)  They also acknowledged that, upon

---

[1] The SBIC Act is codified, as amended, at 15 U.S.C. § 661 et seq.  Its corresponding regulations are at Part 107 of Title 13 of the Code of Federal Regulations, 13 C.F.R. § 107.20 et seq. ("Regulations").

licensure, Acorn would "be regulated by the U.S. Government" and "subject to extensive federal law and substantial regulation relating to the governance and operation of SBICs."  (Information Memorandum, Pl. Ex. A at 001-03013.)

The Subscription Agreement included an Agreement of Limited Partnership.  ("Limited Partnership Agreement" or "LPA," Pl. Ex. A at 001-03032 - 03101.)  The LPA set forth five remedies that could be exercised against a private limited partner in the event that it failed to make a capital contribution: interest on overdue contributions, termination of right to make further capital contributions, forfeiture of interest in the partnership, withholding and application of distributions, and required sale of interest in the partnership.  (LPA § 3.4.)  As will be discussed, three of the five remedies could only be exercised with SBA approval.  (Id.)

On January 11, 1999, John Torkelson ("Torkelson"), the President and Manager of ATP, sent a modified subscription agreement ("MSA") to Beharry, stating that if ACI became delinquent in its contributions, the exclusive remedy available would be to terminate ACI's ability to make further capital contributions (LPA § 3.4.2), and Acorn would no longer be able to invoke any of the four remedies otherwise available under the LPA.  (MSA, Def. Ex. L at 001-06084).  The letter was written on ATP letter head and signed by Torkelson.  (Id.)

ACI committed to contribute capital in installments totaling $2,880,000.  (Pl. Ex. H at S27-01427.)  The other defendants committed to contribute smaller amounts, totaling $1,800,000.  (Id.)  On January 26, 2001, Torkelson sent defendant Beharry a letter on Acorn letterhead to inform him of a Capital Call of $782,500 on ACI pursuant to the Subscription Agreement.  (Pl. Ex. I at S07-02165.)  Torkelson said that the funds must be received by March 15, or Acorn would have "no choice but to execute its remedies under Section 3.4, which may include Forfeiture of interest in the

Partnership." (Id.)  The same letters were sent to the other Defendants, informing them of capital

calls in the amount each of them owed.  (Ex. I.)  On March 15, 2001, a final capital call was made.

All Defendants admit that they did not fund the entire amount of Acorn's capital call made pursuant

to the January 26, 2001 letter.  (Defendants' Answers to Requests for Admissions at Nos. 28, 29, R.

Propper Answer at Nos. 25, 26, Pl. Ex. B.)  ACI paid $112,500 in response, leaving a balance of

$670,000 unpaid.  The collective unpaid balance of the other Defendants was $368,333, for a total

amount in controversy of $1,038,333 plus interest.

On June 14, 2001, the SBA sent Torkelson a commitment letter.  ("Commitment Letter," Pl.

Ex. MM at 016-01282 - 01283.)  This letter committed $5,000,000.00 in securities to reserve

leverage subject to the conditions of the letter.  (Id. at 016-01282.)  The second condition listed was

that the General Partner would take action in accordance with the LPA "to collect committed capital

called from the private limited partners and not received" (emphasis added).   (Id. at 016-01283.)

The letter was signed by Harry Haskins of the SBA and John Torkelson for Acorn, by ATP.  (Id.)

On June 22, 2001, Torkelson sent an email message to Mark Mead at the SBA announcing

his intent to terminate ACI's ability to make further capital contributions (LPA § 3.4.2) if payment

was not received by June 30, 2001.  (Ex. 1 to Rooney Aff.)  Three days later, Torkelson sent

electronic correspondence to Mr. Beharry, indicating that Acorn could accept late payments with

interest along with a firm payment schedule, or alternatively, Acorn would be forced to terminate

ACI's ability to make further capital contributions on June 29, 2001.  (Ex. J to Beharry Dec.)

On June 29, 2001, Torkelson sent to ACI correspondence on Acorn letterhead, invoking

section 3.4.2 of the LPA and terminating ACI's right to make further capital contributions to Acorn.

(Pl. Ex. WW.)  The letter further stated that ACI's commitment would be deemed reduced to the

timely contributions it had made, and therefore its total capital would be $2,210,000.  (Id.)

In January 2003, the United States commenced a suit against the Acorn Fund.  U.S. v. Acorn Technology Fund, L.P., Civil Action No. 03-0070.  On January 17, 2003, this court, acting under 15 §687c and 28 U.S.C. § 754, appointed the SBA as Receiver for the Acorn Fund.  On October 29, 2003, the Receiver brought the present action against Defendants.

### III. The Summary Judgment Standard.

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In examining both motions, we must view the facts in the light most favorable to the nonmovants and draw all reasonable inferences in their favor.  InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 159-60 (3d Cir. 2003).

The party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact.  Fed. R. Civ. P. 56(c).  Once the movant has done so, the opposing parties cannot rest on the pleadings.  To defeat summary judgment, they must come forward with probative evidence establishing the prima facie elements of their claim.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The nonmovants must show more than the "mere existence of a scintilla of evidence" for elements on which they bear the burden of production.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  An inference based upon speculation or conjecture does not create a material fact.  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n. 12 (3d Cir.1990).  On cross-motions for summary judgment, the standard of review does not change.  Rains v. Cascade Indus., Inc., 402 F.2d

241, 245 (3d Cir. 1968).  Each moving party must independently show that there is no genuine issue

as to any material fact and that it is entitled to judgment as a matter of law.  Id.; see Fed. R. Civ. P.

56.

## IV.  Discussion

Defendants do not dispute that they did not pay the full amounts they "irrevocably"

committed to the partnership in December 2001 (see Subscription Agreement §1.1; Pl. Ex. H) or that

the amount of non-payment collectively totals $1,038,333.  Therefore, Defendants must show that

there is a material disputed fact as to their payment obligation to survive summary judgment.

Defendants have asserted three possible reasons why their payment is excused: (1) that the parties

entered an agreement amending the Subscription documents so that the only remedy for non-payment

was prohibition from contributing further capital; (2) that Receivers released them from their

payment obligations in June 2001; and (3) that a host of affirmative defenses excused Defendants'

non-payment.  These three assertions are addressed in turn, followed by a discussion on whether

Defendants' payment obligation includes interest.

## A. Modified Subscription Agreement

The first issue raised in this case is whether the Modified Subscription Agreement that

Torkelson sent to Beharry on January 11, 1999, is valid and controls the remedies available to the

Acorn Fund against ACI.  Receiver asserts a number of arguments against the validity of the MSA,

including (1) that the agreement is invalid because the SBA and Acorn did not consent to the

agreement; (2) that its introduction is barred under the parol evidence rule; and (3) that the

-6-

conditions of the MSA themselves are not permissible under applicable laws and regulations. The court finds the first argument dispositive, so we need not discuss the latter two issues raised.

The MSA can only be valid if the SBA approved it, and the undisputed evidence shows it did not. The LPA incorporates the provisions of the SBA Annex PS ("Annex PS") attached to the LPA "with the same force and effect as if fully set forth herein." (LPA § 1.2, Pl. Ex. A at 001-03049.) In the event of a conflict between the LPA and the Annex PS, the Annex PS controls. (LPA § 1.3.2, Pl. Ex. A at 001-03049.) The Annex PS speaks to the question of whether SBA consent is required to implement the MSA, so it controls.[2] Under the Annex PS, any amendment to the LPA which "affects the rights, obligations, or liabilities of any Preferred Limited Partner or the SBA . . . shall require the prior written consent of the SBA" (emphasis added). (SBA Annex PS § 10.2, Pl. Ex. L at 001-01845.)

The LPA granted Acorn five different remedies against ACI if it failed to contribute the committed capital. The attempt to strip Acorn of the right to do anything but terminate further capital contributions in the event of Defendants' default was, in effect, an attempt to restrict the right of Acorn to collect on promised capital contributions. Any attempt to restrict Acorn's right to collect necessarily affects SBA's rights, because it strips SBA of its ability to collect. This action is also contrary to the SBIC Act and implementing Regulations, which protect SBA's ability to collect in the event of liquidation, and grants SBA first priority in liquidation. See 13 C.F.R. § 107.500. Because the MSA, in amending the LPA, would affect the SBA's rights, its ratification must comply with the Annex PS § 10.2, and the SBA's written consent was therefore required to validate the MSA. Defendants have proffered no evidence of written SBA approval. In fact, there is no

---

[2] The SBIC Act is the only authority that is supreme to the Annex PS.

indication that SBA <u>even received notice</u> of the MSA.

In addition to the SBA consent required to validate the MSA in accordance with the Annex PS, the MSA would also have to be in compliance with other LPA procedures.  In order for the parties to modify the LPA, a part of the Subscription documents, the parties had to satisfy the modification requirements set forth in Section 3.2 of the Subscription Agreement: the modification must have occurred in writing and be signed by the party against whom any waiver, change, discharge, or termination was sought.  The only party that signed the MSA was Torkelson.  (Def. Ex. L, at 001-06085.)  Thus, the MSA can only be valid if Torkelson's actions bound Acorn.

The Subscription Agreement provides that it should be construed in accordance with New Jersey law (Subscription Agreement, § 3.7, Pl. Ex. A at 001-03027.)  A partnership "is an entity distinct from its partners." N.J. Stat. Ann. § 42:1A-9.  The General Partner does, of course, have the power to take some actions on behalf of the partnership.  The LPA grants the General Partner "full, exclusive, and complete power and authority" to manage the business and affairs of the partnership and formulate investment and accounting policies.  (LPA § 6.1.2, Pl. Ex. A at 001-03068.)  This power includes the ability to "enter into agreements and contracts with parties and to give receipts, releases and discharges with respect to the Partnership's business and any matters incident thereto." (LPA § 6.1.2(b), Pl. Ex. A at 001-03068.)  However, these actions are subject to restrictions; the General Partner cannot perform any act in violation of any applicable law or regulation, and cannot perform any act "not otherwise permitted" without the consent of the private limited partners.  (LPA § 6.2, Pl. Ex. A at 001-03070.)

The scope of the agreements that ATP could enter without the consent of the other partners must be construed in light of New Jersey law.  Under New Jersey law, all partners are considered

agents of the partnership for the purpose of carrying on business and an "act of a partner, including the execution of an instrument in the partnership name," can bind the partnership if the act is within the ordinary course of partnership business.  N.J. Stat. Ann. 42:1A-13(a).  However, an act of a partner which is "not apparently for carrying on in the ordinary course the partnership business or business of the kind carried on by the partnership binds the partnership only if the act was authorized by the other partners.  Id. at 42:1A-13(b).  In this case, the letter was not authorized by any of the other partners.  Therefore, the MSA is binding on the partnership only if it was an act that is considered to be within "the ordinary course of business."

Entering the MSA cannot be considered an act within the ordinary course of business. Amending the partnership documents would not seem to be an act within the ordinary course of business,[3] but more importantly, an act which Torkelson possessed no authority to undertake without SBA consent cannot qualify as an ordinary act.  Also, there is no showing that Torkelson undertook these actions on Acorn's behalf.  Under his signature line is the title "President and Manager," his role at ATP.  (Id.)  The letter appears on ATP letterhead.  (Id. at 001-06083).  Further, while the letter begins by stating that ATP, as General Partner, would like to thank Mr. Beharry on behalf of Acorn, the relevant part of the letter which restricts the remedies states, "The General Partner represents that in the event that ACI is delinquent . . . the exclusive remedy available to the General Partner and the Fund will be to terminate the right of ACI to make further capital contributions . . . ." (emphasis added).  (Id. at 001-06084.)  Acorn made no such representation.  Therefore, the MSA

---

[3] Defendants argue that the MSA is not contrary to the LPA because it merely expresses "the exercise in advance of a right that the General Partner always had under the terms of the Acorn LPA."  This construction of the MSA ignores that it purported to strip Acorn of the other four remedies it possessed under the LPA.

is invalid because the SBA's consent, and Acorn's consent, was required. Only ATP's consent was obtained. That does not suffice.

The argument that the MSA is binding upon Acorn because Torkelson had apparent authority in entering the MSA, and ACI reasonably relied on Torkelson's apparent authority, likewise fails. Under the doctrine of apparent authority, a "principal is bound by the acts of his agent within the apparent authority which he knowingly permits the agent to assume, or which he holds the agent out to the public as possessing." Lobiondo v. O'Callaghan, 815 A.2d 1013, 1018 (N.J. Super. 2003)).

ACI advances arguments similar to those made by Acorn Technology Fund and rejected in United States v. Acorn Technology Fund, 295 F. Supp.2d 494 (E.D. Pa. 2003). In the ATF case, Fleet National Bank, a holder of a certificate of deposit in the name of ATF, argued that even if Torkelson lacked express authority to enter into certain Pledge and Security Agreements, his actions nonetheless bound Acorn because Summit, Fleet's predecessor in interest, had no knowledge that Torkelson lacked this authority. This court rejected that argument, in part, because Summit was a sophisticated party ("a banking institution regularly engaged in the practice of lending"), knew that ATF was regulated by the SBA, and "had actual notice that Torkelson was exceeding his power as manager of ATP." Acorn Technology Fund, 295 F. Supp.2d at 511-12. Similarly, Defendants are sophisticated parties. Each defendant in this case represented that he was an "Institutional Investor" and that he had "sufficient knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks" of the investment. (LPA § 13.4.2(a), Pl. Ex. A at 001-03091; Subscription Agreement § 2.1(c)(ii), id. at 001-03024.) Defendants were all party to and received the Subscription documents, and knew or should have known the limitations on Torkelson's power, including that Acorn and SBA approval were necessary to validate the MSA. For these

reasons, this court denies ACI's apparent authority and reasonable reliance arguments.


**B. Release**

_____Defendants argue in their briefs that Acorn, in June 2001, released Defendants from their obligation to contribute further capital.  However, Defendants mostly ignore that Acorn cannot unilaterally invoke all of the remedies it is granted under the LPA in the event of failure of a limited partner to contribute capital.  The provision on termination of the right of a private limited partner to make further capital contributions provides that if the limited partner fails to make the contribution within thirty days of its due date, the General Partner can only invoke this remedy with the consent of the SBA as provided in LPA § 5.2 (LPA § 3.4.2, Pl. Ex. A at 001-03053.)  Under LPA § 5.2, Acorn cannot enter any release, settlement, or take any other action which terminates the obligations of a Partner to make capital contributions without the prior written consent of the SBA. (LPA § 5.2.3, Pl Ex. A at 001-03064.)  There is an exception, however: if Acorn gives the SBA thirty days prior notice of a proposed legal proceeding, arbitration, or other action under the agreement with respect to a private limited partner's default on a capital contribution, and SBA consent is required, the SBA will be deemed to have consented unless it objects via written notice within the thirty-day period.  (LPA § 5.2.4, Pl Ex. A at 001-03064.)

Defendants argue that there is sufficient evidence for a jury to find that the SBA consented to the General Partner's invocation of Section 3.4.2.  As discussed, under the LPA, consent could either occur by an express statement by the SBA, or if a release constitutes a "proposed legal proceeding, arbitration, or other action under the agreement," consent could be inferred if Acorn provided advance notice to SBA, and SBA did not respond within thirty days.  This court rejects that

SBA expressly or impliedly consented to the invocation of Section 3.4.2.

Defendants argue that SBA, by instructing Acorn to take action "in accordance with" the terms of the LPA in its Commitment Letter sent to Torkelson on June 14, 2001, directed Acorn to invoke LPA § 3.4.2 (Def. Response to Pl.'s Brief at 17.)  However, there is no evidence that the action Acorn was to take in accordance with the LPA was a release.  In fact, the language suggests the contrary; the remainder of the sentence states that the action requested in accordance with the LPA was to "collect committed capital called from the private limited partners and not received" (emphasis added).  (Pl. Ex. MM at 016-01283.)  Defendants' argument that this language constituted a directive to release Defendants' obligations is simply untenable.[4]  Defendants also assert that Michael K. Wyatt, Acorn's attorney and former General Counsel for the SBA, and one of the defendants, Michael D. Chermak, believed that the June 29, 2001 letter had been sent with the consent of the SBA (Def. Response to Pl.'s Brief at 16-19.)  However, Wyatt and Chermak's opinions are insufficient to create a disputed material fact, where prior, written consent of the SBA is required by regulation and the Subscription Agreement documents and no evidence of such has been put forth.

The argument that SBA consented by silence is likewise untenable.  As noted, the scope of the provision which allows SBA silence to be deemed consent only covers "proposed legal proceeding[s], arbitration[s] or other action[s] under the provisions of the Agreement."  A capital release does not fall within the scope of this exception to the written consent requirement.  Moreover, even if it did, there is no communication that satisfies the requirements of LPA § 5.2.

_____

[4] SBA's communications prior to that date also stated unequivocally that it had no intention to release Defendants of their commitment to contribute the pledged capital.  (See April 12, 2001 emails to Defendants, Pl. Ex. O.)

The only communication that could have possibly constituted a request for a release under LPA § 5.2 was a June 22, 2001, email from Torkelson to Mark Mead at the SBA.  Within this email, Torkelson included a proposed email to send from himself to Defendants, in which he would ask Defendants to pay their late capital payments with interest, or alternatively surrender the right to make further capital contributions.  (Pl. Ex. SS at SBA01-13268.)  Torkelson asked for SBA comments, while stating that he hoped to send the proposed email "as soon as possible, preferably today."  (Id.)

This procedure did not comply with the requirements of LPA § 5.2 for at least three reasons.

First, the Limited Partnership Agreement specifies that notifications required under the LPA "shall be in writing and . . . mailed from within the United States by first class mail, prepaid postage, or . . . prepaid telegram . . . ."  (LPA § 13.2, Pl. Ex. A at 001-03090.)  Torkelson's communication via electronic mail, merely requesting "comments," was therefore insufficient to constitute "written notice" under LPA § 5.2.  (Pl. Ex. SS at 01-13268.)  SBA never waived this written notification requirement.  (See Letter from Haskins to Torkelson (July 20, 2001), Pl. Ex. P at SBA 01-07671 (noting that because Acorn's communications to SBA regarding the defaulting partners were sent via e-mail, SBA had not received written notice that complied with the requirements of Section 13.2.))

Second, notice was not given "thirty (30) days prior" to the proposed action; instead, the requested action was to take place that same day.  (Id.; LPA § 5.2.)

Third, the email was sent to Mark Mead, who did not have the power to approve the release; that authority rested with Harry Haskins, the Acting Associate Administrator for Investment.  (Mead Declaration ¶5, Pl. Ex. Q; Haskins Declaration ¶7, Pl. Ex. S.)  Although SBA did not send its

approval in response to Torkelson's draft email, Torkelson failed to wait the thirty-day reply window afforded to SBA and sent the email to Mr. Beharry on June 25, 2001, followed by an "Action of Manager" that purported to release ACI and its co-defendant limited partners from their commitments on June 29, 2001. (Ex. J to Beharry Dec.; Pl. Ex. WW.)

Even assuming <u>arguendo</u> that Torkelson's request for SBA's approval of the release was valid, SBA timely rejected the request at least as of July 20, 2001. On that date, Haskins sent a letter to John Torkelson that was a clear rejection of any attempted release. (See Pl. Ex. P ("Please be advised that SBA does not consent to the release or termination of any Acorn partner's obligation to contribute capital. SBA will not approve a release unless an Institutional Investor acceptable to SBA assumes the unfunded commitment of the defaulting partner."))

Defendants have not alleged that the SBA released defendants of their capital commitments at any point after this date. Therefore, Defendants have failed to put forth evidence to create a dispute of material fact as to whether SBA consented to a release. Without SBA consent, Acorn could not release Defendants of their commitment as a matter of law.

## C. Affirmative Defenses

Defendants raise numerous affirmative defenses to attempt to excuse their duty to contribute the capital they committed to Acorn. However, these defenses all lack merit and can easily be dismissed on summary judgment.[5] Defendants have not pled specific facts to support a breach of

---

[5] Even if Defendants' affirmative defenses had merit, the court would agree with Receiver's argument that Defendants cannot use state or local laws to avoid their obligations of repayment and that the affirmative defenses would be contrary to SBA's preference in liquidation, to which all Defendants agreed. (See Pl.'s brief at 27-31.)

the implied covenant of good faith and fair dealing, nor have they shown a condition on which payment was based which Receivers breached, excusing Defendants' payment obligation, as required to show antecedent breach.  Defendants' promissory estoppel, fraud in the inducement, and mistake claims are predicated on the existence of a promise by Acorn, or reasonable reliance, neither which can be tenably claimed, as discussed in part VI.A, supra.  Finally, Defendants' waiver and election of remedies arguments are predicated on the side letter being valid, which it is not, for the reasons discussed in part VI.A, surpa.  Because Acorn never waived any rights or elected any remedy from its menu of options, these arguments lack merit.  Therefore, the affirmative defenses asserted can be dismissed.

Accordingly, we determine that because Acorn never consented as a matter of law to the asserted Modified Subscription Agreement, its remedies were not limited, and because SBA never consented as a matter of law to release Defendants' capital commitment, Defendants' payment obligation was not terminated.  Therefore, Receivers are entitled to the $1,038,333 in capital irrevocably committed to Acorn.

**D. Interest**

One of the remedies available to Acorn in the event of a Limited Partner's nonpayment is interest on overdue contributions.  (LPA § 3.4.1, Pl. Ex. A at 001-03052.)   Specifically, the provision provides that when a contribution becomes thirty days overdue, "then the General Partner, may, in its sole discretion, elect to charge such Limited Partner interest at an annual rate equal to ten percent (10%) on the amount due" (not to exceed the amount of such Private Limited Partner's Capital Account) from the date it became due until the earlier of (i) the date on which the Partnership

receives the payment or (ii) the date of any notice given by the General Partner to the Limited Partner pursuant to Sections 3.4.2, 3.4.3 or 3.4.5.  (Id.)

Defendants argue that Receiver is not entitled to interest because only the General Partner, not the Receiver, can invoke this remedy and because notice invoking 3.4.2 was given by the General Partner to the Defendants on June 29, 2001, meaning that no interest could be accrued after that date. Defendants' former argument is easily dismissed; the Receivership Order vests Receiver with the powers Acorn's General Partner enjoyed.  (Receivership Order ¶2).  As to the latter argument, Acorn's June 29 letter did attempt to invoke Section 3.4.2. (Pl. Ex. WW).  However, as discussed in part IV.B., supra, the attempted release under 3.4.2 was ineffective because it was done without the required SBA consent.  Because 3.4.2 was not validly invoked, Defendants' obligations to contribute capital and, therefore, interest if they failed to do so did not terminate.  Receiver is entitled to payment in full, plus interest.


## V.  Conclusion.

For the foregoing reasons, the court grants Receiver's Motion for Summary Judgment and denies Defendant's Motion for Summary Judgment.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE U.S. SMALL BUSINESS : CIVIL ACTION
ADMINISTRATION, :
as Receiver for Acorn Technology Fund, L.P. :
:
Receiver, : NO. 03-5982
:
v. :
:
RICHARD D. PROPPER, et al., :
:
Defendants.

**ORDER**

AND NOW, this 2nd day of October, 2008, upon consideration of Receiver's Motion for
Summary Judgment, Defendants' Motion for Summary Judgment, and the respective Responses,
it is hereby ORDERED that Receiver's motion is GRANTED and Defendant's motion is
DENIED for the reasons set forth in the attached memorandum.  Accordingly, judgment is
entered in favor of Receiver and against Defendants on all counts for the following amounts:

(1) Judgment in favor of Plaintiff and against Defendant **Acorn Connecticut
Investments, L.P.** in the amount of **$1,161,333.33**, plus accrued interest at
$183.56/day after July 15, 2008;

(2) Judgment in favor of Plaintiff and against Defendant **Richard D. Propper** in the
amount of **$222,443.87**, plus accrued interest at $35.16/day after July 15, 2008;

(3) Judgment in favor of Plaintiff and against Defendant **Kerry S. Propper** in the
amount of **$43,333.33**, plus accrued interest at $6.85/day after July 15, 2008;

(4) Judgment in favor of Plaintiff and against Defendant **P. Timothy Garton** in the amount of **$43,333.33**, plus accrued interest at $6.85/day after July 15, 2008;

(5) Judgment in favor of Plaintiff and against Defendant **Michael D. Chermak** in the amount of **$173,333.33**, plus accrued interest at $27.40/day after July 15, 2008;

(6) Judgment in favor of Plaintiff and against Defendant **Charles R. Smith** in the amount of **$69,333.33**, plus accrued interest at $10.96/day after July 15, 2008;

(7) Judgment in favor of Plaintiff and against Defendant **Kenneth M. Borow** in the amount of **$86,666.67**, plus accrued interest at $13.70/day after July 15, 2008.


BY THE COURT:


S/ James T. Giles
J.

-18-